CV-S-00-0760



CV-S-00-0760-0001



06/07/2000



*A / /



CV-S-00-0760



CV-S-00-0760-0001



06/07/2000



UNITED STATES DISTRICT COURT
DISTRICT OF NEVADA

RECEIVED
AND FILED

Jun 7  3 02 PM '00

LANCE S. WILSON
CLERK

BY_____
DEPUTY

| | | |
|---|---|---|
| George May, | ) | |
| | ) | |
| Plaintiff, | ) | CASE NO: |
| | ) | |
| vs. | ) | |
| | ) | |
| Mark G. Trato's, Circus | ) | |
| Circus Enterprises, Inc. | ) | |
| and Johnnie B. Rawlinson, | ) | |
| individually, jointly and | ) | |
| severally, | ) | |
| | ) | CV-S-00-0760-JBR-RJJ |
| Defendant's | ) | |
| | ) | |
| | ) | |

## COMPLAINT

1. COMES NOW, the plaintiff, George May, and files this his complaint, and claims against the defendant's:

## FACTS

2. The following facts, and claims against the defendant's herein are common to all counts and causes of action hereinafter plead.

-1-

## JURISDICTION

3. The plaintiff, George May, is a citizen of the State of Florida, and the United States of America.

4. The plaintiff, George May, is presently residing and domiciled in the County of West Palm Beach, State of Florida.

5. The defendant Johnnie B. Rawlinson, is a citizen of the State of Nevada, and the United States of America.

6. The defendant Johnnie B. Rawlinson, is presently residing in Las Vegas, Nevada in Clark County, Nevada.

7. The defendant Circus Circus Enterprises, Inc., is a Nevada Corporation, doing business in the State of Nevada, and incorporated in the State of Nevada.

8. The defendant Mark G. Tratos, is a citizen of the State of Nevada, and the United States of America.

9. The defendant Mark G. Tratos, is presently residing and domiciled in Las Vegas, Nevada, in Clark County, Nevada.

10. This honorable court has jurisdiction over this matter under the Fifth, and Fourteenth Amendment of the United States of America Constitution, 28 USCS §1343, 18 USCS §242, The Civil Rights Act of 1871, 42 U.S.C. §1985, The Civil Rights Act of 1870, 42 U.S.C. §1983.

11. This honorable court has jurisdiction over this matter under Title 28 U.S. Code § 2679, and Title 28 U.S. Code §1331, which grants general jurisdiction on the basis of a federal question. Bivens v. Six Unknown Narcotics Agents, 403 U.S. 388 (1971).

12. This is an action for damages in excess of Seventy Five Thousand Dollars. ($75,000.00).

13. The unlawful acts, and constitutional torts being committed by Johnnie B. Rawlinson are as an individualy, and are Coram Non-Judice, and Johnnie B. Rawlinson has no immunity. ACLU Foundation v. Barr. 952 F.2d 457, 293 U.S. App. DC 101, (CA DC 1991).

14. The defendant Mark G. tratos, and defendant Circus Circus Enterprises, Inc., and Johnnie B. Rawlinson, have conspired with one another, and have received payment, from one another to deprive the plaintiff, of his protected Rights protected under the Civil Rights Act of 1870,42 U.S.C. §1983, The Civil Rights Act of 1871, 42 U.S.C. §1985, and The Fifth, and Fourteenth Amendment of the United States of America Constitution. Fonda v. Gray, 1983 (CA 9) CAL 707 F.2d 435.

15. The defendant Mark G. Tratos, has by his unlawful acts complained of herein deprived the plaintiff, George May of his Protected Rights Protected under 28 USCS §1343(a),(1),(2), (3), The Civil Rights Act of 1870, 42 U.S.C. §1983, The Civil Rights Act of 1871, 42 U.S.C. §1985, and the Fifth and Four- teenth Amendment of the United States of America Constitution.

16. The defendant Circus Circus Enterprises, Inc., has by their unlawful acts complained of herein deprived the plain- tiff, George May, of his protected Rights Protected under 28 USCS §1343,(a),(1),(2),(3),, The Civil Rights Act of 1870, 42 U.S.C. §1983, The Civil Rights Act of 1871, 42 U.S.C. §1985, and the Fifth and Fourteenth Amendment of the United States of America Constitution.

17. The defendant Johnnie B. Rawlinson, individually, Coram Non-Judice, has by her unlawful acts complained of herein deprived the plaintiff, George May, of his protected rights protected under 28 USCS §1343,(a),(1),(2),(3), The Civil Rights Act of 1870, 42 U.S.C. §1983, The Civil Rights Act of 1871, 42 U.S.C. §1985, and the Fifth and Fourteenth Amendment of the United States of America Constitution.

18. The defendant Johnnie B. Rawlinson, seeks to enforce a without subject matter jurisdiction, without jurisdiction of the subject matter, without authority, void, order, order-the plaintiff not to file a complaint for the defendant, Circus Circus Enterprises, Inc., filing false, fraudulent, affidavits with the Patent and Trademark office, and infringing the plaintiff's Registered Copyrighted Trademarks, Picture Marks, in violation of the plaintiff's protected constitutional rights protected under the Fifth, Seventh, Ninth, Thirteenth, and Fourteenth Amendment of the United States of America Constitution, and plaintiff's protected Rights protected under 28 USCS §1343,(a),(1),(2),(3), The Civil Rights Act of 1870, 42 U.S.C. §1983, The Civil Rights Act of 1871, 42 U.S.C. ½1985.

19. The defendant Johnnie B. Rawlinson seeks by an threat and extortion letter to find the plaintiff in criminal contempt of court for a civil contempt order based on a unconstitutional order, that is without subject matter jurisdiction, without jurisdiction of the subject matter, without authority and void. "A court does not have contempt powers to enforce violations of its orders if they are rendered

-4-

without jurisdiction of the subject matter, or the parties. In re Elrod, App. 4 Dist. 455 So. 2d 1325 (1984); Disobedience of order issued without jurisdiction is not contempt. Sandstrom v. State App. 4 Dist. 309 So.2d 17 (1975).

20. Johnnie B. Rawlinson has by her Coram Non-judice Acts as an individual, for payment by the defendant's Circus Circus Enterprises, Inc., of sending letters of threats to the plaintiff, has deprived the plaintiff, George May of his protected Civil, and Constitutional Rights, before mentioned herein.

21. The defendant Johnnie B. Rawlinson has deprived the plaintiff of his protected rights protected by the Bill of rights, and is committing criminal acts against the plaintiff, by sending letters of treats to the plaintiff in violation of 18 USCS §876.

> *No court of law has ever at any time ruled that plaintiff's Registered Copyrights are "IDEA'S" or "concepts" in any ruling, and no court has ever at any time ruled that only the defendant Circus Circus same Trademark not owned by Circus is a "IDEA", or "Concept", the plaintiff's Registered Copyrighted Trademarks, and Picture Marks, cannot be "IDEAS" AND CONCEPTS" for the Plaintiff, and Not IDEA'S and Concepts" for the defendant Circus unless the defendant Circus has payed off the....the court to create the double fiction device as a dog is a dog, not a dog for one person and a cat for another, unless the court is participating in the fraud for payment or stock ownership.
>
> Plaintiff's Registered Copyrights contain many different "IDEA'S, and "Concepts" not just one.
> -5-

## STATEMENT OF THE CASE

22. The plaintiff, George May, re-alleges, and re-avers his claims and allegations contained in number 1, through 22, as if fully set forth herein, and would further state:

23. The plaintiff, on or about April 1990, took his drawings for his gambling casino to Lee Linton, an Architect in Las Vegas, Nevada, to prepare Site Plans, Zoning Applications, and Architectural Plans for his Gambling Casino after, entering into a contract to purchase property from Mel Larson, of Circus Circus Enterprises, Inc.

24. The plaintiff's Architectprepared renderings of the Plaintiff's Gambling Casino, that included many different concepts, idea's, that were turned into the plaintiff's written Architectural Plans, written Trademarks, and written Designs, the Architect Lee Linton then took photographs of the plaintiff's Trademarks to make Picture Marks.

25. That on June 28, 1990, Lee Linton, mailed the plaintiff's Trademarks, and picture marks to the plaintiff establishing priority of the plaintiff's Trademarks, and Picture Marks for his gambling casino.

26. Lee Linton then took the plaintiff's Trademarks, and Picture Marks to Circus Circus Enterprises, Inc., for Mel Larsen to sign the zoning application.

27. On or about 1993, the defendant Mark Trato's filed a false, fraudulent application with the Patent and Trademark office to falsely and fraudulently register the plaintiff's Trademark, and picture mark as owned by Circus Circus, Inc.

-6-

28. That upon learning that the defendant Circus Circus Enterprises, Inc., had constructed the plaintiff's building, after copying the plaintiff's Architectural Plans, the plaintiff herein filed a complaint against Circus Circus Enterprises, Inc., before his Copyrights were registered with the Copyright office.

29. The defendant Mark Tratos, filed a not signature authenticated affidavit of someone who may not be a Veldon Simpson, that is false, fraudulent, and that cannot be accepted by any court of law under Federal Evidence Rule 901, in the plaintiff's case and compromised the judge to have the plaintiff's complaint dismissed.

30. The plaintiff, then filed more complaints against the defendant Circus Circus Enterprises, Inc., and each and every case was dismissed based on res-judicata, based on the false, fraudulent affidavit of Bart Simpson, by judges who had been compromised by the defendant's Mark trato's, and Circus Circus Enterprises, Inc.,

31. Since the plaintiff's Copyrights were not registered at the time that plaintiff's complaint was filed all judgements were and are without subject matter jurisdiction as no Copyright register numbers existed, and the court cannot entertain a copyright suit on a not registered copyright.

32. The defendant's Circus Circus Enterprises, Inc., and Mark Trato's then caused an without subject matter jurisdiction, without jurisdiction of the subject matter, without authority order to be issued that said the plaintiff cannot file any more complaints based on plaintiff's concept's, and idea:

-7-

33. The without subject matter jurisdiction, without jurisdiction of the subject matter, without authority order did not state what concept or idea except an con-cept, and idea of a pyramid shaped hotel, and not the many idea's and concept's contained in the plaintiff Architect-ural plans, and did not state other causes of actions for Trademark, and Picture Mark infringement.

34. Hence the defendant's Circus Circus Enterprises, Inc., and Mark Trato's and the payed off court have used devices to deprive the plaintiff of his protected Civil and Constitutional Rights before mentioned herein, for over 6 years.

35. The defendant's herein have by their unlawful acts, Constitutional Torts, and deprivations before mentioned herein, have caused damages to the plaintiff, George May.

-8-

## COUNT I
## DAMAGES

36. The plaintiff, George May, re-alleges, and re-avers his claims and allegations contained in number 1, through 36, as if fully set forth herein and would further state:

37. The defendant's herein have caused damages to the plaintiff, George May, herein, by their unlawful acts before mentioned herein, and will continue to cause damages to the **plaintiff**.

38. The plaintiff, George May, pursuant to Federal Rule of Civil Procedure 38(b), and the Seventh Amendment of the United States Constitution invokes his right to a trial by jury in this case herein.

WHEREFORE, the plaintiff, George May, demands judgement against the defendant's herein in the amount of $1 million dollars, and the cost of this complaint herein of $150.00.

Respectfully submitted

George May
P.O. box 32247
Palm Bch. Gardens
Fl. 33420
561-333-7334

-9-

PLAINTIFF'S ADDENDUM

ATTACHED HEREIN, PART

OF ALL PLEADINGS FOR

ALL PURPOSES, FEDERAL

RULE OF CIVIL PROCEDURE

10(c)

# UNITED STATES CONSTITUTION

[3]  The Senators and Representatives before mentioned, and the Members of the several State Legislatures, and all executive and judicial Officers, both of the United States and of the several States, shall be bound by Oath or Affirmation, to support this Constitution; but no religious Test shall ever be required as a Qualification to any Office or public Trust under the United States.

## ARTICLE VII

The Ratification of the Conventions of nine States shall be sufficient for the Establishment of this Constitution between the States so ratifying the Same.

ARTICLES IN ADDITION TO, AND AMENDMENT OF, THE CONSTITUTION OF THE UNITED STATES OF AMERICA, PROPOSED BY CONGRESS, AND RATIFIED BY THE LEGISLATURES OF THE SEVERAL STATES PURSUANT TO THE FIFTH ARTICLE OF THE ORIGINAL CONSTITUTION.

## AMENDMENT I [1791]

Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances.

## AMENDMENT II [1791]

A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed.

## AMENDMENT III [1791]

No Soldier shall, in time of peace be quartered in any house, without the consent of the Owner, nor in time of war, but in a manner to be prescribed by law.

## AMENDMENT IV [1791]

The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

## AMENDMENT V [1791]

No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury, except in cases arising in the land or naval forces, or in the Militia, when in actual service in time of War or public danger; nor shall any person be subject for the same offence to be twice put in jeopardy of life or limb; nor shall be compelled in any criminal case to be a witness against himself, nor be deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use, without just compensation.

## AMENDMENT VI [1791]

In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law, and to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him

## UNITED STATES CONSTITUTION

the list, the Senate shall choose the Vice-President; a quorum for the purpose shall consist of two-thirds of the whole number of Senators, and a majority of the whole number shall be necessary to a choice. But no person constitutionally ineligible to the office of President shall be eligible to that of Vice-President of the United States.

## AMENDMENT XIII [1865]

Section 1. Neither slavery nor involuntary servitude, except as a punishment for crime whereof the party shall have been duly convicted, shall exist within the United States, or any place subject to their jurisdiction.

Section 2. Congress shall have power to enforce this article by appropriate legislation.

## AMENDMENT XIV [1868]

Section 1. All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

Section 2. Representatives shall be apportioned among the several States according to their respective numbers, counting the whole number of persons in each State excluding Indians not taxed. But when the right to vote at any election for the choice of electors for President and Vice President of the United States, Representatives in Congress, the Executive and Judicial officers of a State, or the members of the Legislature thereof, is denied to any of the male inhabitants of such State, being twenty-one years of age, and citizens of the United States, or in any way abridged, except for participation in rebellion, or other crime, the basis of representation therein shall be reduced in the proportion which the number of such male citizens shall bear to the whole number of male citizens twenty-one years of age in such State.

Section 3. No person shall be a Senator or Representative in Congress, or elector of President and Vice President, or hold any office, civil or military, under the United States, or under any State, who having previously taken an oath, as a member of Congress, or as an officer of the United States, or as a member of any State legislature, or as an executive or judicial officer of any State, to support the Constitution of the United States, shall have engaged in insurrection or rebellion against the same, or given aid or comfort to the enemies thereof. But Congress may by a vote of two-thirds of each House, remove such disability.

Section 4. The validity of the public debt of the United States, authorized by law, including debts incurred for payment of pensions and bounties for services in suppressing insurrection or rebellion, shall not be questioned. But neither the United States nor any State shall assume or pay any debt or obligation incurred in aid of insurrection or rebellion against the United States, or any claim for the loss or emancipation of any slave; but all such debts, obligations and claims shall be held illegal and void.

Section 5. The Congress shall have power to enforce, by appropriate legislation, the provisions of this article.

## AMENDMENT XV [1870]

Section 1. The right of citizens of the United States to vote shall not be denied or abridged by the United States or by any State on account of race, color, or previous condition of servitude.

## § 1343. Civil rights and elective franchise

(a) The district courts shall have original jurisdiction of any civil action authorized by law to be commenced by any person:

(1) To recover damages for injury to his person or property, or because of the deprivation of any right or privilege of a citizen of the United States, by any act done in furtherance of any conspiracy mentioned in section 1985 of Title 42 [42 USCS § 1985];

(2) To recover damages from any person who fails to prevent or to aid in preventing any wrongs mentioned in section 1985 of Title 42 which he had knowledge were about to occur and power to prevent;

(3) To redress the deprivation, under color of any State law, statute, ordinance, regulation, custom or usage, of any right, privilege or immunity secured by the Constitution of the United States or by any Act of Congress providing for equal rights of citizens or of all persons within the jurisdiction of the United States;

(4) To recover damages or to secure equitable or other relief under any Act of Congress providing for the protection of civil rights, including the right to vote.

(b) For purposes of this section—

(1) the District of Columbia shall be considered to be a State; and

(2) any Act of Congress applicable exclusively to the District of Columbia shall be considered to be a statute of the District of Columbia. (June 25, 1948, ch 646, § 1, 62 Stat. 932; Sept. 3, 1954, ch 1263, § 42, 68 Stat. 1241; Sept. 9, 1957, P. L. 85-315, Part III, § 121, 71 Stat. 637; Dec. 29, 1979, P. L. 96-170, § 2, 93 Stat. 1284.)

## HISTORY; ANCILLARY LAWS AND DIRECTIVES

**Prior law and revision:**

This section is based on Act Mar. 3, 1911, ch 231, § 24, paras. 12, 13, 14, 36 Stat. 1092 (former 28 USC § 41 (12), (13), and (14).

Words "civil action" were substituted for "suits," "suits at law or in equity" in view of Rule 2 of the Federal Rules of Civil Procedure. Numerous changes were made in arrangement and phraseology.

**Amendments:**

1954. Act Sept. 3, 1954, in paras. (1) and (2), substituted "1985 of Title 42" for "47 of Title 8".

1957. Act Sept. 9, 1957, in the catchline, inserted "and elective franchise", and added para. (4).

1979. Act Dec. 29, 1979 designated the existing provisions as subsec. (a); and added subsec. (b).

**Other provisions:**

Application of 1970 amendments. Act Dec. 29, 1970, P. L. 96-170, § 3, 93 Stat. 1284, provided: "The amendments made by this Act [amending this section and 42 USCS § 1983 and adding this note] shall apply

109

Guarantees to all persons the same rights that white citizens have to make enforceable contracts, to testify in court and to "the full and equal benefit of all laws and proceedings" for the protection of person and property.

Provides criminal penalties for any person who, under color of law, deprives any person of Federal civil rights, or who subjects any person to different penalties than are prescribed for the punishment of citizens because that person is an alien or because of that person's race or color.

41st Cong., Sess. II. Ch. 114, 16 Stat. 141, 144, 1870

42 U.S.C. §1983

## CIVIL RIGHTS ACT OF 1871

Grants the right to any person to bring a civil action for damages against a person who has conspired with one or more other persons: (1) to prevent him from exercising the duties of a Federal official; (2) to interfere with his acting as a witness or juror in a Federal court; (3) to deny to him the equal protection of the laws; (4) to prevent him from enforcing the equal protection of the laws; or (5) to interfere with his right to vote in a Federal election.

Grants the right to any person to bring a civil action against a person who, acting under color of law, deprives him of any right guaranteed by the U.S. Constitution.

42d Cong., Sess. I. Ch. 22, 17 Stat. 13, 1871

42 U.S.C. §1985

## CIVIL RIGHTS ACT OF 1964, SECTION 902

Authorizes the U.S. Attorney General to intervene in any significant court suit brought to prevent denial of the equal protection of the laws under the Fourteenth Amendment on account of race, color, religion, sex or national origin.

P.L. 88-352, 78 Stat. 266, 1964
P.L. 92-318, 86 Stat. 375, 1972

42 U.S.C. §2000(h)

# I. EQUAL PROTECTION OF THE LAWS

## FIFTH AMENDMENT TO THE CONSTITUTION

Forbids the Federal Government to deprive any person "of life, liberty, or property, without due process of law." In *Bolling v. Sharpe* (347 U.S. 497, 1954), the Supreme Court held that this "due process" clause forbids the Federal Government to deny to any person the equal protection of the laws on account of race. Hence, Federal laws that protect the rights of persons must protect all persons equally, without regard to race.

Adopted 1791

## THIRTEENTH AMENDMENT TO THE CONSTITUTION

Prohibits slavery and authorizes Congress to enforce this prohibition by appropriate legislation.

Adopted 1865

## FOURTEENTH AMENDMENT TO THE CONSTITUTION

Among its other provisions, forbids every State to deny to any person "the equal protection of the laws." As does the Fifth Amendment with respect to the Federal Government, this Amendment obliges States to protect the rights of persons equally, that is, without discrimination against any class of persons on account of race or of any other unreasonable classification.

Adopted 1868

## CIVIL RIGHTS ACT OF 1866

Guarantees to every U.S. citizen the same rights that white citizens have "to inherit, purchase, lease, sell, hold, and convey real and personal property."

39th Cong., Sess. I. Ch. 31, 14 Stat. 27, 1866

42 U.S.C. §§1981, 1982

## CIVIL RIGHTS ACT OF 1870

Provides criminal penalties for each of two or more persons who conspire "to injure, oppress, threaten, or intimidate" any citizen exercising any Federal civil right. Provides criminal penalties for each of two or more persons who "go in disguise on the highway" or on the property of a citizen in order to interfere with that citizen's exercise of any Federal civil right.

UNITED STATES DISTRICT COURT
DISTRICT OF NEVADA

George May,                        )
                                   )
            Plaintiff,             )   CASE NO: CV-S-98-1322 JBR (LRL)
                                   )
vs.                                )
                                   )
Circus Circus Enterprises,         )
et. al.                            )
                                   )
            Defendant's            )
                                   )
_____)

PLAINTIFF'S NOTICE OF UNCONSTITUTIONAL WITHOUT
SUBJECT MATTER JURISDICTION, WITHOUT JURISDICT-
ION OF THE SUBJECT MATTER, WITHOUT AUTHORITY,
VOID CALENDAR SETTING, NOTE, AND EXTORTION LETTER
IN VIOLATION OF THE FIFTH, AND FOURTEENTH AMEND-
MENT OF THE UNITED STATES CONSTITUTION AND FEDERAL
STATUTES 18 U.S.C.A. §876, FILED JUNE 1, 2000

COMES NOW, the plaintiff, George May, and files this his

notice of unconstitutional, without subject matter jurisdiction,

without jurisdiction of the subject matter, without authority,

void, calender setting, note, and extortion letter, in viol-

ation of the Fifth, and Fourteenth Amendment of the United

States Constitution, and Federal Statutes 18 U.S.C.A. §876,

filed June 1, 2000, for cause as follows:

*"We are all over 21, the court....without subject matter
jurisdiction, without jurisdiction of the subject matter,
and without authority threatens.....plaintiff if he does
not go to Johnnie B. Rawlinson gambling casino," in Las
Vegas Nevada.

-1-

1. The Judge Johnnie B. Rawlinson, who is paid by the defendant Circus Circus Enterprises, Inc., its agent's and assigns or that has stock in the defendant's it's agents and assigns, has issued an Extortion Threat to the plaintiff, George May, ordering the plaintiff George May to fly to Las Vegas, that is unconstitutional, and without subject matter jurisdiction.

2. The Extortion letter by Johnnie B. Rawlinson, is based on a without subject matter jurisdiction, without jurisdiction of the subject matter, without authority, void judgement, entered by the Court, based on a not signature authenticated affidavit, that cannot be accepted by any court of law of a Veldon Simpson, or Bart Simpsen, in a without subject matter jurisdiction, without jurisdiction of the subject matter, without authority, void, judgement entered on the plaintiff's copyright complaint filed before the plaintiff had registered his Registered Copyrights.

3. The Extortion letter by Johnnie B. Rawlinson is a threat by the defendant's joint venture partner who the plaintiff has filed a complaint against who also pays Johnnie B. Rawlinson, through its agents, and assigns, or that Johnnie B. Rawlinson has stock in the Joint Venture Partner's company's agents or assigns.

4. Johnnie B. Rawlinson has issued the Extortion Letter, against the plaintiff, George May, on orders of the defendant's and their joint venture partners, because the defendant's and the joint venture partners, and Johnnie B. Rawlinson do not want to make more money by a joint venture with the plaintiff.

-2-

WHEREFORE, the plaintiff, George May, files this his notice of the Extortion Letter from Johnnie B. Rawlinson, that consists of a Calender Setting, and NOTE:, based on unconstitutional, without authority, threats, who is payed by the defendant's and their joint venture partners, and who has stock in the defendant's and their joint venture partners, Company's, agents, and assigns, and prays that Johnnie B. Rawlinson not issue an without subject matter jurisdiction, without jurisdiction of the subject matter, without authority, void, warrent for the arrest of the plaintiff, on a bogus civil contempt charge, that would only be "bogus" valid in Nevada, as contempt is not an extradictable offense, so that the plaintiff does not have to sue Johnnie B. rawlinson, the defendant's, and their joint venture partners, for $690,000.00.

Respectfully submitted

George May
P.O. Box 32247
Palm Bch. Gardens
Fl. 33420
561-333-7334

-3-

I hereby certify that a copy of the foregoing was
mailed this June 7, 2000, to;


Johnnie B. Rawlinson
Foley Federal Building
300 Las Vegas Blvd. S.
Las Vegas, Nevada 89101


Mark G. Tratos
Quirk 7 Tratos
3773 Howard Hughes Parkway
Suite 500 North
Las Vegas, Nevada 89109

George May
P.O. Box 32247
Palm Bch. Gardens
Fl. 33420
561-333-7334

-4-



Albert Einstein

YOU don'T HAVE to be EINSTEIN TO SEE WHAT IS going oN

*The only justifiable purpose of political institutions is to insure the unhindered development of the individual.*

Albert Einstein

Printed with permission from the National Archives: Niels Bohr Library

**Third market.** See Over-the-counter market.

**Third-night-awn-hinde.** By the laws of St. Edward the Confessor, if any man lay a third night in an inn, he was called a "third-night-awn-hinde," and his host was answerable for him if he committed any offense. The first night, forman-night, or uncouth (unknown), he was reckoned a stranger; the second night, twa-night, a guest; and the third night, an awn-hinde, a domestic.

**Third party.** One not a party to an agreement or to a transaction but who may have rights therein. See also Party; Privity.

**Third party beneficiary.** One for whose benefit a promise is made in a contract but who is not a party to the contract. Chitlik v. Allstate Ins. Co., 34 Ohio App.2d 193, 299 N.E.2d 295, 297, 63 O.O.2d 364. A person not a party to an insurance contract who has legally enforceable rights thereunder. See also Privity.

**Third party claim proceeding.** A proceeding for the purpose of determining whether the debtor has any right, title or interest in the property upon which the levy has been made and the judgment of the court in such proceedings is only made conclusive as to the right of the plaintiff or other person in whose favor the writ runs to have the property taken and to subject it to payment for other satisfaction of his judgment. Deevy v. Lewis, 54 Cal.App.2d 24, 128 P.2d 577, 579. See also Third party complaint.

**Third party complaint.** A complaint filed by the defendant against a third-party (i.e., a person not presently a party to the lawsuit). This complaint alleges that the third party is or may be liable for all or part of the damages which the plaintiff may win from the defendant. See Fed.R.Civil P. 14. For requisite content of third party claim under Federal Rules of Civil Procedure, see Complaint.

**Third-party practice.** Procedural device whereby defendant in an action may bring in additional party in claim against such party because of a claim that is being asserted against the defendant. Denneler v. Aubel Ditching Service, Inc., 203 Kan. 117, 453 P.2d 88, 91. See also Third-party complaint; Vouching in.

**Thirds.** The designation, in colloquial language, of that portion of a decedent's personal estate (one-third) which goes to the widow where there is also a child or children.

**Thirteenth Amendment.** Amendment to U.S. Constitution which abolished slavery and involuntary servitude in 1865.

**Thirty-day letter.** A letter which accompanies a revenue agent's report (RAR) issued as a result of an Internal Revenue Service audit of a taxpayer (or the rejection of a taxpayer's claim for refund). The letter outlines the taxpayer's appeal procedure before the Internal Revenue Service. If the taxpayer does not request any such procedures (i.e., District Conference or Appellate Division Conference) within the 30-day period, the Internal Revenue Service will issue a statutory notice of deficiency (the "90-day letter"). See also Ninety-day letter.

**Thirty-nine articles.** See Articles of faith.

**This.** When "this" and "that" refer to different things before expressed, "this" refers to the thing last mentioned, and "that" to the thing first mentioned. "This" is a demonstrative adjective, used to point out with particularity a person or thing present in place or in thought.

**This day six months.** Fixing "this day six months," or "three months," for the next stage of a bill, is one of the modes in which the house of lords and the house of commons reject bills of which they disapprove. A bill rejected in this manner cannot be reintroduced in the same session.

**Thoroughfare.** The term means, according to its derivation, a street or passage *through* which one can *fare* (travel); that is, a street or highway affording an unobstructed exit at each end into another street or public passage. If the passage is closed at one end, admitting no exit there, it is called a *"cul de sac."*

**Thrave.** In old English law, a measure of corn or grain, consisting of twenty-four sheaves or four shocks, six sheaves to every shock.

**Thread.** A middle line; a line running through the middle of a stream or road. See Filum; Filum aquæ; Filum viæ; Thalweg.

**Threat.** A communicated intent to inflict physical or other harm on any person or on property. A declaration of an intention to injure another or his property by some unlawful act. State v. Schweppe, Minn., 237 N.W.2d 609, 615. A declaration of intention or determination to inflict punishment, loss, or pain on another, or to injure another by the commission of some unlawful act. U. S. v. Daulong, D.C.La., 60 F.Supp. 235, 236. A menace; especially, any menace of such a nature and extent as to unsettle the mind of the person on whom it operates, and to take away from his acts that free and voluntary action which alone constitutes consent. A declaration of one's purpose or intention to work injury to the person, property, or rights of another, with a view of restraining such person's freedom of action.

The term, "threat" means an avowed present determination or intent to injure presently or in the future. A statement may constitute a threat even though it is subject to a possible contingency in the maker's control. The prosecution must establish a "true threat," which means a serious threat as distinguished from words uttered as mere political argument, idle talk or jest. In determining whether words were uttered as a threat the context in which they were spoken must be considered.

Threats against the President and successors to the President, mailing of threatening communications, and other extortionate acts, are federal offenses. 18 U.S.C.A. § 851 et seq.

See also Coercion; Duress; Extortion.

*Terroristic threat.* Any threat to commit violence communicated with intent to terrorize another, or to cause the evacuation of any building, place of assembly or facility of transportation, or in wanton disregard of the risk of causing such terror or evacuation.

**Threatening letters.** Mailing of threatening communications is a federal offense. 18 U.S.C.A. § 876.

UNITED STATES DISTRICT COURT
DISTRICT OF NEVADA

**FILED**

JUN 8 11:00 '00

U.S. DISTRICT COURT
BY CLERK, DISTRICT OF NEVADA
DEPUTY

GEORGE MAY, )
)
    Plaintiff-Appellant, )
)
vs. )
)
CIRCUS CIRCUS ENTERPRISES, et al., )
)
    Defendants-Appellees, )

**CALENDAR SETTING**

BY

Case # CV-S-98-1322 JBR(LRL)

**BEFORE THE HONORABLE**
**JUDGE JOHNNIE B. RAWLINSON**

**XX  TAKE NOTICE** that a proceeding has been set for the place, date and time set forth below:

| Place:<br>U. S. District Court<br>Foley Federal Building<br>300 Las Vegas Blvd., South<br>Las Vegas, NV 89101 | Before:<br><br>The Honorable Johnnie B. Rawlinson<br>Courtroom # 1 | Date and Time:<br><br>**Friday, June 23, 2000**<br>@ 2:30 p.m. |
|---|---|---|

**TYPE OF PROCEEDING(S):** HEARING REGARDING DEFENDANT'S MOTION FOR
AN ORDER TO SHOW CAUSE WHY PLAINTIFF SHOULD NOT BE HELD IN
CONTEMPT AND SANCTIONED (#39)

*NOTE: GEORGE MAY MUST APPEAR PERSONALLY.  FAILURE TO APPEAR WILL*
*RESULT IN ISSUANCE OF A WARRANT FOR HIS ARREST ON CONTEMPT CHARGES*

_____ **TAKE NOTICE** that the above referenced proceeding has been continued as indicated
below:

| Before:<br><br>The Honorable<br>Johnnie B. Rawlinson | Previous Date and Time: | Date and Time Continued to: |
|---|---|---|

LANCE S. WILSON, Clerk
United States District Court

By _____
               Deputy Clerk

DATE: June 1, 2000

THE NATIONAL LAW JOURNAL

Monday, March 27, 2000

# NEWS

## IS WEEK



**ALSO:**

*Sidebar:* A rainmaker lawyer bolts Silicon Valley firm for another Internet enterprise. **A6**

*Week in Review:* The 2d Circuit upholds time limits on habeas petitions under the AEDPA. **A7**

# Rehnquist has change of datatude

## Memo on disclosure of judges' finances in sharp contrast to '93.

**BY TONY MAURO**
AMERICAN LAWYER MEDIA NEWS SERVICE

WASHINGTON—Several years ago, when political scientist Peter Irons sought to market the Supreme Court's oral argument tapes, the court's first reaction was to threaten to sue him.

The court—or at least Chief Justice William H. Rehnquist—has traveled a long way since then, judging by the remarkable March 14 decision by the Judicial Conference to, in effect, allow federal judges' financial disclosure forms to be posted on the Internet.



A memorandum released after the announcement of the vote made it clear that he had become an advocate for openness on disclosure forms.

"What a refreshing change," said Lucy Dalglish, executive director of the Reporters Committee for Freedom of the Press. "He got them to acknowledge this was a mistake and fix it."

APBnews.com had gone to court to force the disclosure after its request for the financial reports filed by all federal judges was denied.

Justice Rehnquist could have sat on the sidelines. But as presiding officer of the Judicial Conference, he has transcendent power to influence its decision making, and he apparently decided to use it.

His Feb. 15 memo to the full conference endorsed the view that the anti-disclosure decision by its Financial Disclosure Committee should be rescinded and that he thought the release of the forms was required.

The Ethics in Government Act bars dissemination of the forms for commercial purposes, he noted, but makes an exception for "news and communications media." The exception, he wrote, clearly includes APBnews.com, a Web site that focuses on criminal justice news.

"It is to be expected that closer public scrutiny will be applied when judges decide issues affecting judges," he wrote. "We have already seen evidence of this in editorial commentary, and I suspect it will increase. Moreover, the fact that officials from the executive and legisla-

tive branches must also file disclosure reports makes the committee's position more difficult to defend."

The Irons episode may have provided a case study of how not to react to calls for disclosure of judicial materials. The threat to sue propelled the tapes to best-seller status. Ultimately the court relented, not only dropping its threat but basically ending all restrictions on the use of oral argument tapes once they go to the National Archives at the end of each term.

An adage warns against battling with anyone who buys ink by the barrel. In the case of financial disclosure reports, Justice Rehnquist's advice was: It doesn't pay to fight companies that end their names in dot-com. ■



Many cottages and homes on
Miami Beach were torn open by
the combination of water and
wind in the September 1926
storm. (Photo courtesy of the
Florida State Archives)



Miami Beach was blasted by the September 1926 storm. Many buildings lost their roofs, and deep
sand filled the lobbies of hotels and casinos along the strand. (Photo courtesy of Noel Risnychok)

causeway never made it to the other side. All around the Miami area, people
were caught outside of shelter and, in some cases, away from their loved ones.
Many whose houses were severely damaged by the earlier winds were crushed
when the winds shifted and their homes collapsed. Within the next hour, the
gusts grew more intense until they reached the top speed measured at the Allison Hospital. Most who experienced the "lull" had no concept of the hurricane's rotational forces. Many marveled at how the storm had managed to
stop and then "change direction."

After the storm had passed Miami, survivors slowly staggered into the
streets to witness the destruction. In an official report on the storm, Gray
wrote: "The intensity of the storm and the wreckage that it left can not be adequately described. The continuous roar of the wind; the crash of falling
buildings, flying debris, and plate glass; the shriek of fire apparatus and ambulances that rendered assistance until the streets became impassable; the terrifically driven rain that came in sheets as dense as fog; the electric flashes
from live wires have left the memory of a fearful night in the minds of the
many thousands that were in the storm area."

Perhaps the most dramatic account of the 1926 hurricane can be found in
*Florida Hurricane and Disaster 1926*, a pictorial diary of the storm by L. F. Rear-



*Hardee's Casino on the south end of Miami Beach was heavily damaged in the September 1926 storm. (Photo courtesy of Noel. Risnychok)*



*Miami's streets were flooded with water and traffic after the September 1926 hurricane passed. (Photo courtesy of Noel Risnychok)*

His candle went out. In pitch blackness he heard all the windows crash open as two waves, one from the street and one from the ocean, filled the room with swirling sea water to his waist. Some dark object rolled against his knees. It was a half-drowned policeman. For hours they stood on a table in water to their hips, roofed with the extraordinary howling-crashing-roaring of wind and rain and sea.



April 21, 1997

Mr. George May
P.O. Box 32247
Palm Beach Gardens, FL 32247

Dear Mr. May:

Thank you very much for all the information you sent relative to my concerns in Palm Beach; it is very much appreciated. I believe this material will be quite helpful, and I have sent it on to my attorneys for review.

With best wishes,

Sincerely,

Donald J. Trump

THE TRUMP ORGANIZATION

# State role in tunnel project still upsets casino execs

**Associated Press**

ATLANTIC CITY — Nearly 16 months after work began on a $330 million road-and-tunnel connector here, executives for the two biggest casino names in town are still bitter about the state's involvement in the project.

Park Place Entertainment Corp. CEO Arthur Goldberg and Trump Hotels & Casino Resorts CEO Nicholas Ribis reiterated their opposition Thursday to state incentives for Mirage Resorts Inc. and its planned $1 billion resort in the marina district.

The state is paying two-thirds of the cost of the 2.2-mile road, which will link the Atlantic City Expressway with the marina district site where Mirage plans to build.

Mirage persuaded the state to help finance the project by saying its casino was unlikely to be built without the road improvements.

Donald Trump and Goldberg have said all along that the project and companion legislation providing tax breaks for Mirage are inappropriate incentives to give an out-of-state company that owns no casinos here.

State and local leaders, however, said the road project will benefit other casinos, too.

In consecutive addresses to a New Jersey Conference of Mayors luncheon Thursday, Ribis and Goldberg sounded the theme anew, without mentioning either Mirage or the tunnel by name.

But they left little doubt among the 300 mayors, municipal officials, casino industry leaders and regulators who were on hand for the speeches what they were referring to.

"I don't think that's the role of government, to come into town and subsidize a company," Goldberg said. "It's a problem of too much government interference."

He added: "What good does it do to have someone come here who really doesn't want to come here unless you make it exceedingly wonderful for them?"

When Ribis took the microphone, he said Goldberg had said what he planned to say. He went on to point out that it was Trump and Goldberg and their companies — which now own half the casinos in town

— that have built up Atlantic City since 1978.

"Donald put his money where his mouth is, as he always does," Ribis said. "Mr. Trump and Mr. Goldberg wrote the checks and hired the people, not because someone said you can have this or you can have that if you come here," Ribis said.

Mirage spokesman Alan Feldman declined comment Thursday on Ribis' and Goldberg's statements.

Curiously, they came a day after it appeared as though Mirage and Trump were burying the hatchet. On Wednesday, the companies announced that they had agreed to drop two civil lawsuits involving each other.

In one, Mirage claimed Trump and Hilton Hotels Corp. had pursued litigation and lobbying to block Mirage from ever entering the Atlantic City market.

In the other, Mirage sued Trump and several individuals for allegedly stealing trade secrets.

No money was exchanged as part of the settlements.

Johnnie B Rawlinson

Trump + Goldberg

Hilton + Schaeffer

Circus

# Mirage shares' worth could exceed offer price, analyst says



Mirage Resorts could be worth as much as $25 a share, or about 41 percent higher than the $17 a share offered for the company Wednesday by MGM Grand, writes Credit Suisse First Boston gaming analyst David Anders in a report titled, "What's Mirage Really Worth?"

Mirage owns a mix of assets including its Shadow Creek golf course in North Las Vegas and several airplanes, which Anders values at as much as $1.15 a share.

The company is also developing a 50-50 joint venture casino project with Boyd Gaming Corp. in Atlantic City, a project that could be worth an additional 61 cents a share, Anders writes.

Mirage Resorts also owns 55 acres of land on the Strip that includes the Boardwalk hotel. Anders values the acreage at as much as $1.52 per share.

Tossed in with other assumptions about cash-flow multiples and cost savings of as much as $100 million from a Mirage Resorts-MGM Grand merger, Anders arrives at a stock value of $20 to $25 per share.

MGM Grand offered what it labeled a "friendly" offer early Wednesday, a day after Mirage Resorts shares dipped to $10.88.

Since then Mirage Resorts' shares have climbed more than 30 percent to a Friday closing price of $15 on the New York Stock Exchange.

Mirage Resorts executives have declined to comment about the offer, instead saying the company's seven-person board will consider the offer at a meeting that one source said will be held this week.

MGM Grand shares, which closed at $41.81 on Wednesday fell to $39.19 Friday on the New York Stock Exchange.

―――

TRIVIA TIME: How many Indian casinos operate in California?

―――

TIP TO THE WEEK: A curiosity of the craps table is that a player can make the exact same bet and depending on how the bet is made, face different odds, writes the Philadelphia Daily News.

For instance, a player can make a "place" bet on, say, the 6. In that bet, the shooter — the person rolling the dice — must roll a 6 before ever rolling a 7, after the point is established, writes the paper. The payoff on the place bet is 7-to-6 (true odds are 6-to-5) and the house edge on such a bet is a fairly tame 1.5 percent.

However, the player can make essentially the same bet — that a 6 will be rolled before a 7 — by "buying" a 6. The payoff is at true odds but there's a 5 percent commission on winning bets. The house edge is about 4.7 percent.

Even more disadvantageous is a bet called the Big 6 (as well as Big 8). It's the same proposition — the shooter must roll a 6 (or, for the Big 8, an 8) before ever rolling a 7. But it pays even money, which works out to a 9 percent house edge.

―――

TRIVIA ANSWER: A total of 37 Indian casinos operate in California, where

Please see CHIPS/2D

# Detroit casinos earn millions per day

**Associated Press**

DETROIT — Detroit's two temporary casinos apparently are taking in roughly $2 million a day from gamblers. And an official with the parent company of one of the gambling halls expects it to do even better as the weather warms.

MGM Grand Detroit Casino, which opened last summer, averaged revenues of about $1.1 million a day in the quarter that ended Dec. 31.

By comparison, the local MotorCity Casino on average brought in at least $800,000 a day from its Dec. 14 opening to Jan. 31, the end of the quarter for parent Mandalay Resort Group.

The revenue for both casinos includes the amount gamblers left behind at tables and slot machines, as well as at the buffet and other restaurants. But analysts say most of the revenue is from gaming.

Across the Detroit River in Ontario, Casino Windsor has not reported any revenue numbers since last fall, when that gambling hall reported an average daily take of $1.6 million.

Last month, a Casino Windsor spokesman said that site had not lost much business after the MotorCity casino opened. Bettors could be spending as much as $3.5 million each day among the three casinos, the Detroit Free Press reported.

Financial information about MotorCity came Wednesday as part of an earnings release by Las Vegas-based Mandalay Resort Group, which owns 53.5 percent of the Detroit casino. The rest is owned by Detroit-area investors who include Marian Ilitch, who also owns Little Caesars Enterprises with her husband, Detroit Tigers and Red Wings owner Mike Ilitch.

MotorCity's operating profit was $7.7 million, lower than what analysts expected, representing an operating margin of 20 percent, The Detroit News reported. By comparison, MGM Grand Detroit earned $33.4 million in the fourth quarter, with a 33-percent margin.

Glenn Schaeffer, Mandalay Resort Group's president and chief financial officer, said he expects MotorCity business to increase going forward into summer.

"That was our experience in Windsor," he said for the Mandalay group that was part of a consortium that managed Casino Windsor. "It will only get better with warmer weather."

He added: "We're on course. It's cold in Detroit in January."

Dennis Forst, a gaming analyst for McDonald Investments in Los Angeles, said the MotorCity's numbers were somewhat disappointing — but not bad given that winter is a challenging period.





---

## COMPUTER SHOW
### Liquidation Super Sale
The Most POWERFUL Show In Town
FEB. 26 & 27, SAT. & SUN., 10-5 PM
## CASHMAN CENTER
850 Las Vegas Blvd. North
AMERICAN MEGA SHOWS • www.megashow.com
WHOLESALE PRICES • OPEN TO PUBLIC • SWAP
Next Show: Last weekend each month

## EARN 13%
You Control Your Investments
No Power of Attorney
IRA & CD Rollover Short Term
www.PacificWestMortgage.com
NV Lic #00021          (702) 892-3737

## No one has ever lost a penny.
## EARN 11¼%
- You get an interest check every month.
- Secured by deeds of trust.
- Short terms available.
- Extensive list of references available.
- Call for information and a free brochure.

### (702) 227-0965
## Del Mar
MORTGAGE
2901 El Camino, Ste. 206, Las Vegas, NV 89102
www.delmarmtg.com
A Sunderland Company
On the NASDAQ: OTC-BB: DLMA

* However, past performance does not guarantee future results or success. Money invested through a mortgage broker is not guaranteed to earn any interest or return and is not insured.

Nevada State Mortgage Company License #MBO384
A public company OTCBB: DLMA

JOHNNIE B RAWLINSON
MGM +
SCHAEFFER, CIRCUS
+

# Regulatory hurdles muddle MGM Grand-Mirage merger

☐ A regulation adopted in response to the acquisitions of Howard Hughes might thwart a takeover attempt.

**By Jeff Simpson**
lasvegas.com Gaming Wire

MGM Grand's "friendly" offer to acquire Mirage Resorts could face some unfavorable state and federal regulatory hurdles, according to gaming and antitrust experts.

Shannon Bybee, executive director of the University of Nevada, Las Vegas' International Gaming Institute, said Nevada gaming regulations allow regulators to examine the effect of such mergers on the state and the affected counties and cities.

Specifically, Nevada gaming regulators will be weighing in on the MGM Grand-Mirage merger because of Nevada Gaming Commission Regulation 3.070.

The chairman of the Gaming Control Board, Steve DuCharme, said regulators have used the regulation to evaluate acquisitions, including Park Place Entertainment's purchase of Caesars World from Starwood Resorts, since it was enacted in 1969.

Regulation 3.070 was adopted in response to Howard Hughes' numerous casino acquisitions in the 1960s. The U.S. Justice Department threatened to intervene on antitrust grounds if Nevada allowed Hughes to add to his earlier purchases and buy the Stardust.

Hughes decided not to buy the Stardust, but the Gaming Commission adopted the regulation, which listed criteria to evaluate proposed mergers, and it was ratified by the Legislature.

Under the regulation, among the

**Please see ANTITRUST/2A**

NEVADA PROPERTY PROFILE



MIRAGE RESORTS

Bellagio
The Mirage
Treasure Island
Golden Nugget - Las Vegas
Golden Nugget - Laughlin



MGM Grand
New York - New York
Whiskey Pete's*
Buffalo Bill's*
Primm Valley Resort*

*Property located in Primm, Nevada.          Review-Journal

STEVE WYNN

MGM

*Contract*
*MAY 21*
*1990*

*69*
*or*
*0*

*public*
*faith*

*Not*
*Loaded*
*Dice*

*April 21, 1995*
*Bart Simpson*

## OTHER IDEAS

# Honesty in gambling

**P**eople who have lost disputed jackpots on malfunctioning machines are not faring well, losing their appeals in the courts. .... But the gaming industry is not faring well either, because every disputed jackpot diminishes public faith in the honesty of the industry.

These are not just nickel-and-dime jackpots at issue. They are $1.74 million at the now-closed Splash Casino in Mississippi, $1.798 million at the Silver Legacy in Reno, $330,000 at Harrah's Ak-Chin Casino in Arizona, $4.7 million at Sam's Town in Mississippi, $2.9 million at the Grand Rhonde Tribe's Spirit Mountain Casino in Oregon. ... Industry leaders can say accurately that these are isolated incidents ... but the cases are growing as the machines become more complex and payoffs grow larger.

So it is good that the industry is moving to eliminate this problem. The approach taken by International Game Technology and state gaming authorities sounds ideal: program the slot machines so that when there is a malfunction, the reels spin slowly instead of stopping. Then players will understand that there is a malfunction, and they will not see a big jackpot line up before their eyes. IGT has done well to reprogram all of its slots except Megabucks, which will be reprogrammed after the current jackpot is hit. The state should do more than suggest reprogramming. It should mandate retrofitting in every machine in the state as soon as possible.

Nevada can never afford to have gaming's honesty questioned.

The RENO GAZETTE JOURNAL
July 15

## IN OTHER WORDS

"I know the way you prepare when you go out to tackle something. So no doubt you

# REVIEW-JOURNAL

EDITORIALS

*"NOW"*

## Why Vegas works

### ■ Governors could learn from city's success.

We trust that the four dozen chief executives gathered in Las Vegas this week for the National Governors Association will take a good look around.

A short trip down the Strip will reveal more than $6 billion worth of construction under way: Mirage Resorts' Bellagio, the Caesars Palace expansion and MGM renovation and expansion alone account for nearly $3 billion of that work. And, down the road, work on the $1.8 billion The Venetian has commenced.

Should the governors venture east or west of the resort corridor, they will witness the consequences of those huge investments — new homes — thousands of them — sprouting everywhere, and along with them, new schools, churches, commercial enterprises, professional offices, roads, bridges, whatever.

The Las Vegas metro area is now more populous than the city of Detroit and, as a city, vastly more successful, infinitely more vibrant and more interesting — more interesting, indeed, than most of the world's notable cities.

Las Vegas works. In the space of just a decade, it has evolved from a gambling town into a fully developed destination resort city of international renown, visited not by the day trippers who feed the economy in Atlantic City, but by tourists from the world over who seek far more than just slot machines and table games. It remains the nation's fastest growing metro area, a job-creation dynamo with an enviable quality of life and high per capita income. New residents continue to flock here at the rate of 4,000 a month.

What makes Las Vegas so attractive to these new immigrants? What underlies the creation of this youngest of America's great cities? What makes Las Vegas work?

The foundation for the success of Las Vegas is a low-tax, business-friendly environment, light on meddlesome regulations and heavy on entrepreneurship.

Nevada long ago lost its monopoly on legalized gambling. Indeed every state but Utah and Hawaii now sanction some sort of gaming. But as the competition from other states heated up, Las Vegas not only did not suffer — it prospered as never before. Why? Because unlike other states, Nevada does not saddle its casinos with crushing taxes. Nevada's 6¼ percent gross gaming tax compared with rates of 20 percent and more in other jurisdictions — allows Las Vegas casinos to offer much more favorable rates of return, giving gamblers a far better chance of winning than on, say, a Mississippi River gambling boat. Nevada also allows its casinos a far freer hand to run their business as they see fit than in other states where gambling is legal, but often stifled with regulation, where it practically takes an act of the legislature to move a slot machine from one location on the casino floor to another.

Nevada's lack of personal and corporate taxes — and its respect for personal freedom — also are conducive to economic growth and to immigration of both businesses and individuals from high-tax states such as California. Las Vegas' tradition of electing local leaders who know the value of a business-friendly environment is among the factors that keep this city humming.

Perhaps some of the governors gathered at The Mirage will contemplate the success of Las Vegas and take home some ideas of value.

*INTERNATIONAL NEWS SERVICE*

*ALL GAMES IN LAS VEGAS ARE RIGGED THROUGH PHONE LINES TO COMPUTERS SO YOU WILL NEVER EVER WIN*



# (ADS)
# ACCOUNTING DATA SYSTEM

Each *MEGABUCKS* carousel has a casino communicator (CCOM) built into it. This computer monitors each slot machine every few seconds. It sends this information via dedicated telephone line to a central computer system in Reno, Nevada. Here the data is collected and compiled, then sent back to all the *MEGABUCKS* units. This information is then displayed on the progressive meters. This whole process takes only five to ten seconds.



### CCOM:
1. The CCOM polls the slot machines sequentially. (1-2 seconds). The CCOM then broadcasts the latest progressive amount to all slot machines.
2. The progressive controller also recognizes the progressive amount broadcast and displays it.
3. The CCOM requests meters from all slot machines every 10 minutes.

### ADSC:
1. The ADSC polls all of the CCOMS on a given telehone circuit continuously (5-10 seconds).
2. The ADSC's then broadcast the current progressive amount to the CCOMS.
3. Every 5 seconds, the ADSC sends the accounting data system the total number of new coins during that period.

### ADS:
1. The ADS communicates with the ADSC's and records important events on disk and on a printer -- it requests meters and CCOM statuses at various times.
2. The ADS calculates the current progressive amount which is sent to ADSC's for forwarding to CCOMs and on to the slot machines (every 5 seconds).



International Game Technology



 **International Game Technology**

July 9, 1990

George May
5790 Whirlaway Rd.
Palm Beach Gardens, FL. 33418

Dear Mr. May,

IGT is pleased to present the following proposal for your potential
casino site in Las Vegas.

After reviewing several slot machine lay-outs near the area you are
considering, I would recommend the following floor mix.

|  |  | CURRENT LIST PRICE |
|---|---|---|
| 90 | Players Edge Plus Slant-Top Pokers | $6,295.00 ea. |
| 90 | Standard Slant cabinets | 300.00 ea. |
| 720 | S-Plus Slots | 4,745.00 ea. |
| 81 | Players Edge Plus Stand-up Pokers | 4,595.00 ea. |
| 28 | Double Screen Keno | 7,500.00 ea. |
| 31 | Players Edge Plus Flat-Bar Pokers | 5,995.00 ea. |
| 4 | Megabucks-N/C for games-IGT collects 6% of handle and pays top two jackpots (See information enclosed) | |
| 8 | Quartermania (See information enclosed) | 5,295.00 ea. |
| 199 | Seats/Complete | 280.00 ea. |
| 801 | Stands | 150.00 ea. |
| 962 | TOTAL MACHINES | |

## TERMS

Lease-All machines and equipment can be leased (with the
exception of Megabucks and Quartermania) through Valley Leasing.
12 to 48 month fixed rate financing is available at normal bank
rates.

Cash-Net 30-IGT would offer a 5% cash discount and an additional
8% quantity discount for purchasing all equipment listed in this
proposal Net 30.

## WARRANTY

6 months on parts
3 months on labor.

 # LEE LINTON · ARCHITECT

## 1800 E. SAHARA AVE. SUITE 111 LAS VEGAS, NEVADA 8910⁴

JULY 02, 1990

MR. GEORGE MAY
5790 WHIRLAWAY ROAD
PALM BEACH GARDENS, FLORIDA
33418

RE:  HOTEL AND CASINO, LAS VEGAS, NEVADA


DEAR MR. MAY;

WE PROPOSE TO PERFORM THE COMPLETE ARCHITECTURAL AND
ENGINEERING PLANS AND SPECIFICATIONS FOR YOUR HOTEL PROJECT
TO INCLUDE THE FOLLOWING:

    1. ALL CIVIL ENGINEERING (GRADING, FLOOD CONTROL,
       ETC.)

    2. SOILS TESTING

    3. ARCHITECTURAL PLANS AND SPECIFICATIONS

    4. MECHANICAL, ELECTRICAL & H.V.A.C. PLANS & SPECS.

    5. STRUCTURAL ENGINEERING PLANS & SPECS.

    6. LANDSCAPE PLANS

    7. RESTAURANT EQUIPMENT PLANS & SPECS.

THE ABOVE WORK WILL COMPRISE OF A COMPLETE SET OF CONSTRUCTION
DOCUMENTS.

THE FEE WILL BE 3-1/2% OF THE COST OF CONSTRUCTION.

WHEN YOU ARE READY TO PROCEED, I WILL PREPARE A STANDARD
A.I.A. LUMP-SUM CONTRACT.  IT WILL REPRESENT ONE TOTAL
PRICE FOR ALL THE WORK, INCLUDING ALL CONSTRUCTION SUPERVISION,
AND THERE WILL BE NO EXTRAS FOR WHATEVER WE NEED TO DO
UNTIL THE DOORS OPEN.

                        SINCERELY,


                        LEE LINTON ARCHITECT



# LEE LINTON · ARCHITECT

## 1800 E. SAHARA AVE. SUITE 111 LAS VEGAS, NEVADA 89104

JUNE 27, 1990

*PAUL FAULKNER*

MR. GEORGE MAY
5790 WHIRLAWAY ROAD
PALM BEACH GARDENS
FLORIDA
33418

DEAR MR. MAY;  *PAULA*

*BY*
*July*
*15th*

I AM PLEASED THAT YOU LIKED OUR PRESENTATION FOR YOUR
LAS VEGAS HOTEL, AND I APPRECIATE YOUR QUICK RESPONSE
WITH THE RETAINER CHECK.

A&F CONSTRUCTION, (702) 362-1600 IS DOING A CONSTRUCTION
BREAKDOWN WHICH HE WILL MAIL DIRECTLY TO YOU.

FOR YOUR BUDGET ESTIMATES, THE ARCHITECTURAL AND ENGINEERING
FEE WILL BE 4% OF THE CONSTRUCTION COST (LESS AMOUNT
PAID TO DATE). THIS WILL INCLUDE AN ARCHITECTURAL, STRUCTURAL,
MECHANICAL, ELECTRICAL, H.V.A.C., CIVIL & LANDSCAPING
PLANS & SPECIFICATIONS AND A TOTAL INTERIOR DECOR PACKAGE.

I WILL SEND A FORMAL PROPOSAL TO YOU, IN CONTRACT FORM,
THIS COMING WEEK TO HAVE IN HAND AS YOU PROGRESS.

SINCERELY,

LEE LINTON, ARCHITECT

# LEE LINTON · ARCHITECT

## 1700 E. DESERT INN RD. SUITE 301 · LAS VEGAS · 735·808(

APRIL 27, 1990

MR. GEORGE MAY
5790 WHIRLAWAY RD.
PALM BEACH GARDENS,
FLORIDA, 33418

PROPOSAL RE: PRELIMINARY DRAWINGS FOR TWO HOTEL AND CASINO
            SITES IN LAS VEGAS, NEVADA.

DEAR MR. MAY

I TOOK THE WEEK TO REVIEW THE CODE REQUIREMENTS WITH THE
VARIOUS GOVERNING AGENCIES, TOVISIT THE SITES AND TO DETERMINE
THE REQUIRED SCOPE OF WORK TO BE DONE FOR THE PURPOSE OF
A ZONE CHANGE.

THE FOLLOWING WORK WILL BE REQUIRED FOR EACH SITE:

1.  A FULLY DELINEATED FLOOR PLAN INDICATING THE PUBLIC AREAS
    (CASINO, RESTAURANTS LOUNGES, SHOWROOM, CONVENTION AND MEETING
    ROOMS, ETC.) SERVICE AREAS (WAREHOUSING, KITCHENS, EMPLOYEE
    FACILITIES, ETC.) AND ADMINISTRATION AREAS. ALTHOUGH THIS DOES
    NOT NEED TO BE FULLY DETAILED, ENOUGH NEEDS TO BE INDICATED
    OF THE INTENT TO ESTABLISH THE REQUIRED PARKING.

2.  A SITE PLAN INDICATING ALL OF THE REQUIRED PARKING BASED
    UPON THE PARKING CODE.

        a. CASINO AND ALL PUBLIC AREAS 20 cars per 1,000 sq,ft,
        b. SERVICE AREAS  1 car per 1,000 sq. ft.
        c. ADMINISTRATION  4 cars per 1,000 sq. ft.
        d. ROOMS 1 car per room to 500 rooms
                 1 car per 2 rooms thereafter

3.  A FULL COLOR RENDERING OF THE PROJECT.

# LEE LINTON · ARCHITECT

## 1700 E. DESERT INN RD. SUITE 301 · LAS VEGAS · 735·8080

A PRELIMINARY INVESTIGATION OF F.A.A. AIRSPACE PENETRATION
INDICATED THAT YOU WILL HAVE NO PROBLEM. FINAL APPROVAL IS
ACCOMPLISHED BY SENDING YOUR PLANS TO THE F.A.A. REGIONAL
OFFICE IN LOS ANGELES.

THE COMPREHENSIVE PRELIMINARY DRAWINGS THAT WE WILL COMPLETE
WILL ALSO ALLOW YOU TO OBTAIN AN ACCURATE CONSTRUCTION COST
ESTIMATE TO WITHIN 5%.

YOU WILL ALSO HAVE IN HAND A FULLY OPERATIONAL PLAN TO PROCEED
WITH A FEASIBILITY STUDY, A PROFORMA AND AN APPRAISAL.

THE FEE FOR ALL THE ABOVE WORK WILL BE $10,000 PER SITE
PAYABLE AS FOLLOWS:

1. RETAINER 50%
2. WHEN ALL OF THE WORK IS COMPLETED 50%

WE WILL PROCEED EXPEDITIOUSLY AS SOON AS WE HAVE YOUR SIGNED
AGREEMENT AND THE RETAINER.

THANK YOU.


ACCEPTED:


_____

MR. G. MAY          DATE

LEE LINTON

MIDDLETOWN, VA. 22645
21AM

**Western Union Mailgram**

4-0348685141002 05/21/90 ICS IPMRNCZ CSP MIAB
1 4074274781 MGM TDRN PALM BEACH GARDENS FL 05-21 0528P EST

GEORGE MAY
5790 WHIRLAWAY ROAD
PALM BEACH GARDENS FL 33418

THIS IS A CONFIRMATION COPY OF THE FOLLOWING MESSAGE!

4074274781 RRB TDRN PALM BEACH GARDENS FL 166 05-21 0528P EST
PMS MEL LARSON VICE PRESIDENT, DLR
CIRCUS CIRCUS HOTEL AND CASINO RPT DLY MGM, DLR
2880 LAS VEGAS BLVD SOUTH
LAS VEGAS NV 89109
DEAR MEL, IT IS OUR POSITION THAT AS AGENT FOR CIRCUS CIRCUS THAT YOU
LEGALLY BOUND CIRCUS CIRCUS TO YOUR REPRESENTATIONS, TO TAKE FULL
RESPONSIBILITY AND LIABILITY FOR THIS PROJECT ON YOUR ESCROW
INSTRUCTIONS OF FEBRUARY 12, 1990 AND YOUR LETTERS WHICH INCLUDE THE
REPRESENTATIONS OF OBTAINING THE IM-1 ZONING.
IT IS ALSO OUR POSITION THAT THE ORIGINAL CONTRACT WITH ALL OF YOUR
VERBAL AND WRITTEN REPRESENTATIONS ARE BINDING ON CIRCUS CIRCUS,
YOURSELF, AND MONEY WORLD REALTORS.
WE HAVE AFFIRMED THE ORIGINAL CONTRACT AND IF THE CONTRACT IS
BREACHED WE WILL LITIGATE IN FLORIDA FEDERAL COURT AGAINST CIRCUS
CIRCUS, YOURSELF, AND MONEY WORLD REALTORS.
PLEASE DISCUSS THE JOINT VENTURE WITH WILLIAM BENNETT PRESIDENT OF
CIRCUS CIRCUS AND MODEL AIRPLANES.
PLEASE HAVE THE ATTORNEY FOR CIRCUS CIRCUS DRAW THE JOINT VENTURE
AGREEMENT.
LEE LINTON HAS THE PLANS AND THE IM-1 PERMIT APPLICATIONS READY FOR
YOUR SIGNATURE.
THIS NEW PROJECT WILL BENEFIT CIRCUS CIRCUS, ALL INVOLVED, AND IT'S
STOCKHOLDERS.
CORDIALLY YOURS,
   GEORGE MAY
   5790 WHIRLAWAY ROAD
   PALM BEACH GARDENS FL 33418

17:24 EST

MGMCOMP



PRIORITY MAIL

MR. GEORGE MAY
5790 WHIRLAWAY RD.
PALM BEACH GARDENS
FLORIDA
33418

PRIORITY MAIL

LEE LINTON
1800 E. SAHARA AVE
#111
LAS VEGAS, NV.
89104





JUNE 28, 1990

PRIORITY
OF TRADEMARK,
PicTuro MARK



## THE UNITED STATES OF AMERICA

### TO ALL TO WHOM THESE PRESENTS SHALL COME:

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office

February 09, 1996

IS TO CERTIFY THAT ANNEXED IS A TRUE COPY FROM THE RECORDS
IIS OFFICE OF THE TRADEMARK FILE WRAPPER AND CONTENTS OF:

MARK APPLICATION: *74/288,747*

DATE: *June 22, 1992*

RATION NUMBER: *1,867,047*

RATION DATE: *December 13, 1994*

*LUXOR AND DESIGN*

RANT: *Ramparts, Inc.*

By Authority of the
COMMISSIONER OF PATENTS AND TRADEMARKS

H. PHILLIPS
Certifying Officer

COUNTY OF   ARR  )

WILLIAM T. MARTIN, being first duly sworn, hereby swears that he is Secretary of applicant corporation and is authorized to execute this application on behalf of said corporation; that he believes said corporation to be entitled to use such mark in commerce; to the best of his knowledge and belief no other person, firm, corporation or association has the right to use said mark in commerce, either in the identical form or in such near resemblance thereto as to be likely, when used in connection with goods or services of such other person, to cause confusion, or to cause mistake, or to deceive; and the facts set forth in this application are true; and further that these statements and the like so made are punishable by fine or imprisonment or both, under Section 1001 of Title 18 of the United States Code, and that such willful, false statements may jeopardize the validity of the application or any registration resulting therefrom.

RAMPARTS, INC.

By: _____
WILLIAM T. MARTIN, Secretary



Subscribed and Sworn to before me

this 16th day of ____June____, 1992.

_____
Notary Public in and for said
County and State

cc-luxor#4.a

CONNIE J. THOMASON
Notary Public-State of Nevada
CLARK COUNTY
My Appointment Expires Dec. 6, 1992

LAW OFFICES
QUIRK, TRATOS & ROETHEL
CHARLESTON OFFICE PARK • 550 E. CHARLESTON BLVD • SUITE D
LAS VEGAS, NEVADA 89104
(702) 386-1778

**U.S. DEPARTMENT OF COMMERCE**
Patent and Trademark Office

| APPLICANT | | PAPER NO. |
|---|---|---|
| | | **ADDRESS** |
| | | Commissioner of Patents and Trademarks Washington, D.C. 20231 |
| | **ACTION NO.** | If no fees are enclosed, the address should include the words "BOX 5." |
| | **MAILING DATE** | Please provide in all correspondence: |
| | | 1. Filing date, serial number, mark, and applicant's name. |
| | **REF. NO.** | 2. Mailing date of this Office action. |
| | | 3. Your telephone number and ZIP code. |
| U.S. DEPT. OF COMM. PAT. & TM OFFICE | | 4. Examining attorney's name and law office number. |

FORM PTO-1525 (5-90)

A PROPER RESPONSE TO THIS OFFICE ACTION MUST BE RECEIVED WITHIN 6 MONTHS FROM THE DATE OF THIS ACTION IN ORDER TO AVOID *ABANDONMENT*. *For your convenience and to ensure proper handling of your response, a label has been enclosed. Please attach it to the upper right corner of your response. If the label is not enclosed, print or type the* Trademark Law Office No., Serial No., *and* Mark *in the upper right corner of your response.*

256318 5/7 ksk

The assigned examining attorney has reviewed the statement of use filed on March 22, 1993 and has determined the following.

Other Name on Specimens

The designation "CIRCUS CIRCUS," which seems to identify a party other than the applicant, appears in the specimens. The applicant must explain the relationship between the applicant and this other party. The applicant must also explain how any use of the mark by that party inures to the applicant's benefit. Trademark Act Section 5, 15 U.S.C. Section 1055; 37 C.F.R. Section 2.38; TMEP section 1201.01.

To establish that the applicant is the owner of the mark, the applicant must explain how the applicant controls the nature and quality of the goods or services provided under the mark by the other party. If the applicant controls use by a written license or other agreement, the applicant may satisfy the above requirement by stating so and providing either of the following: (1) a copy of the license or other agreement or a copy of those portions indicating how the applicant controls the nature and quality of the goods or services or (2) an explanation of the

-2-

as to the agreement, the execution date and any other
relevant facts.

If the applicant exercises control through an arrangement other
than a written agreement, the applicant must provide an
explanation of how the applicant controls the nature and quality
of the goods or services, verified with an affidavit or a
declaration under 37 C.F.R. Section 2.20.

Pending adequate reply to the above, the examining attorney
refuses registration under Trademark Section 1, 15 U.S.C. Section
1051, because the record appears to indicate that the applicant is
not the owner of the mark.

If the applicant has any questions or needs assistance in
responding to this Office action, please telephone the assigned
examining attorney.

KF:ksk

Karen Feisthamel
Trademark Attorney
Law Office 10
(703) 308-9110, ext. 131

16

IN THE UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

George May,     )
          )
 Plaintiff-Appellant, ) No. 99-15517
          )
vs.        ) D.C. No. CV-S-98-01322-JBR
          )
Circus Circus    )
Enterprises, Inc., and )
Ramparts, Inc., D/B/A )
Circus Circus.   )
Enterprises, Inc.  )
          )
 defendant's-Appellees, )
          )
_____)

PLAINTIFF-APPELLANT'S PETITION FOR REHEARING
AND MOTION TO RECALL MANDATE

PLAINTIFF-APPELLANT'S SUGGESTION FOR REHEARING
EN BANC
AND MOTION TO RECALL MANDATE

GEORGE MAY
P.O. BOX 32247
PALM BCH. GARDENS
FL. 33420
561-333-7334

Comes now petitioner, Plaintiff-Appellant, George May,
and files this his petition for rehearing, and motion to
recall mandate, and his suggestion for rehearing en banc,
and to recall mandate filed January 25, 2000, in this case
for cause herein;

1. This honorable court overlooked the fact that the
Plaintiff-Appellant's Trademark, and Picture Mark, is not
a concept, and is the lawful property of the Plaintiff-Appellant.

2. This honorable court overlooked the fact the Plaintiff-
Appellant's, written Trade Mark, and Picture Mark, is United
States of America, Bar Coded Postal Stamped dated June 28, 1990,
sent to Palm Beach International Airport, number PBIPQUV6, ATL
DL 117, DFW DL 408, DL 1524, which is conclusive evidence that
establishes priority of Plaintiff-Appellant's, George May, Trade-
mark, and Picture Mark, over defendant's robbery, and infringe-
ment of Plaintiff's-Appellant's, Trademark, Picture Mark, in 1992.

3. This honorable court overlooked the fact, law and Constit-
ional Law, that their mandate, deprives the Plaintiff-Appellant
of his protected Constitutional Rights protected under section 8.,
[3], of the United States of America Constitution, and his pro-
tected Constitutional Rights protected under The Fifth, and Four-
teenth Amendment of the United States Constitution, and deprives
the Plaintiff-Appellant, George May, of his Civil Rights Pro-
tected under 42 USC §1983, 42 USC § 1985, 28 USCS § 1343(a)(1)(2),
(3)(4).

4. This honorable court overlooked the fact that Federal Evid-
ence Rule 901, prevents a affidavit that is not signature authen-
ticated, as the not signature authenticated affidavit of someone

-2-

who did not produce a picture drivers license, and it is not
stated on the affidavit that the person who produced the pict-
ure drivers license is the same person who signed the affidavit
is Veldon Simpson, on April 21, 1995, cannot be accepted by any
honorable court of law, or used for a judgement, as in this case
for the purpose of res judicata, See United States v. Perlmuter,
693 F.2d 1290, (9th Cir. 1982), AN "AURA OF AUTHENTICITY" is
insufficient; strict compliance with Federal Evidence Require-
ments is necessary; Plaintiff-Appellant's attached affidavit
of defendant's that is not signature authenticated, and that can-
not be accepted by any honorable court of law, under Federal
Evidence Rule 901, of someone who may not be a Veldon Simpson,
used by the defendant's to obtain the void judgement's against
the Plaintiff-Appellant, that have no binding obligation upon the
parties, and that is legally ineffective.

5. A void judgement has no res judicata effect, creates no
binding obligation upon the parties, or their privies, and is
legally ineffective. See Kalb v. Feuerstein (1940), 308 U.S. 433,
60 S Ct. 343; Williams v. North Carolina (1945) 325 U.S. 226, 65
S Ct. 1092; and is a legal nullity, Hicklin v. Edwards (CA8th,
1955) 226 F.2d 410, 21 FR Serv60b.26, Case 1; Schwarz v. Thomas
(CA DC, 1955) 222 F.2d 305, 21 FR Serv 4d.131, Case 1; for this
fact the district court clearly erred by dismissing the Plain-
tiff-Appellant's complaint and clearly erred in its order imposing
Federal Rule of Civil Procedure 11 sanctions, and this honorable
court has clearly erred in it's order and mandate filed January
25, 2000.

-3-

WHEREFORE, this honorable court overlooked the fact and law, that the Plaintiff-Appellant's Trade Mark, and Picture Mark, is not a concept, and that priority of Plaintiff-Appellant's Trade Mark, and Picture Mark, is conclusively established by United States of America Postal service Bar Coded Postal Stamp dated June 28, 1990, Palm Beach International Airport, number PBIPQUV6, and is the lawful property of the Plaintiff-Appellant, under Section 8.,[3], and the Fifth and Fourteenth Amendment of the United States of America Constitution, and the fact and law, that the Federal Evidence Rule 901, prevents defendant's not signature authenticated affidavit, of someone who may not be a Veldon Simpson, from being accepted by any honorable court of law, then being used to obtain the void, no res judicata effect, legally ineffective, legal nullity, judgements against the PLaintiff-Appellant, and for imposing Federal Rule of Civil Procedure 11, sanctions, is prohibited by Federal Rules of Civil Procedure 7(b), (3), 11(b), 26(g)(1), and 26(g)(3), requiring that this courts order, and mandate of January 25, 2000, be recalled, and reversed, and that sanctions and judgement be entered against the defendant's for their false, fraudulent, disclosures, and representations to this honorable court, under Rule 26(g)(3), See In Malutea v. Suzuki Motor Co. 987 F.2d 1536 (11th Cir.), cert. denied, 114 S. Ct. 181, 126 L Ed. 2d 140 (1993), defendant, not only failed to produce certain materials, but actively covered up their existence. The district court struck the answers and imposed a default judgement as a discovery sanction. Since the response of the defendant's was deliberately false, the district court was correct in conclud-that the response was made for an improper purpose. According sanctions were mandatory under the rule.

-4-

Respectfully submitted

George May
P.O. Box 32247
Palm Bch. Gardens
Fl. 33420
561-333-7334

I hereby certify that a copy of the foregoing

was mailed this January 29, 2000, to;

Mark G. tratos
Quirk & Tratos
3773 Howard Hughes Parkway
Suite 500 North
Las Vegas, Nevada 89109

George May
P.O. Box 32247
Palm Bch. gardens
Fl. 33420
561-333-7334

-5-

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

*Void*

*Fabricated evidence*

GEORGE MAY )

    Plaintiff, )

vs. )

)  CASE NO. CV-S-95-00175-DWH (RJJ)

*Fabricated, void*

) AFFIDAVIT OF VELDON SIMPSON

WILLIAM G. BENNETT, )
individually and )
CIRCUS CIRCUS )
ENTERPRISES, INC., )
a Nevada Corporation, )

    Defendants. )

*or certified*
*No sworn or long*
*No supporting*
*renderings,*
*photos, or*
*evidence as*
*required*
*by rule*
*56(e)*

*OR WHO EVER Signs saying HE is veldon simpson*

Veldon Simpson, being first duly sworn upon his oath, states as follows:

1.    I am an adult resident of Clark County, Nevada, and this affidavit is made of my personal knowledge. I am competent to testify to the matters contained in this affidavit.

2.    I am an architect with the firm of Veldon Simpson Architect, Inc. Our firm designed the Excalibur Hotel & Casino for Circus Circus Enterprises, Inc.

3.    In 1991, our firm was requested by Circus to begin conceptualizing another *AFTER CIRCUS HAD ACCESS 5-21-98* large casino resort based around a theme. Circus did not propose or suggest any specific theme. In particular, Circus did not propose or suggest a pyramid image.

4.    The present pyramid design of the Luxor emerged from an evolutionary series of preliminary designs. I initially conceived an Egyptian theme casino in the desert in *NO DESIGNS ATTACHED* connection with a project I intended to develop on my own in the Laughlin, Nevada area. *with MY Architects SALARY* I personally and independently conceived the use of the pyramid image for the Luxor *ATTORNEY LANGUAGE "Who Signed this"* project as a further development of the Laughlin Egyptian project.

*DOES NOT STATE THE TOP of the building FALSE* *DOES NOT STATE WHAT* *DOES NOT STATE WHEN COURT WITH*

5.     The firm's initial goal for the Luxor project was to incorporate an atrium space. In its first stage, the Luxor consisted of traditional hotel towers, "stepped up" on each side of the main entrance, surrounding an atrium space. The atrium was capped by a pyramid shaped dome. The entrance to the project was a modern version of the Hanging Gardens of Babylon.

6.     As the firm began to produce more detailed drawings, it became evident that the atrium would be expensive to construct. It became apparent that it would be more economical to build a single structure allowing the rooms to form the atrium. The single structure eventually evolved into the pyramid form.

7.     Neither William Bennett nor Mel Larson ever suggested to me that the Luxor project involve the pyramid form. The concept and idea of the Luxor pyramid was entirely my own. *But Circus Should Have told me*

8.     I have never had any contact with George May. Prior Mr. May's original suit in this matter, I had never heard of George May or his alleged pyramid project. Furthermore, I have never seen any materials relating to Mr. May's pyramid project.

FURTHER YOUR AFFIANT SAYETH NAUGHT.   *does Not SAY Person who signed is Veldon Simpson By drivers License Id.*

Dated this 21 day of April, 1995.

*NO Signature Authentication of Veldon Simpson*

VELDON SIMPSON

Subscribed and sworn to before me this 21st day of April, 1995, by Veldon Simpson.

*Affidavit void, does not meet the Requirements of FRCP 56(e) or*

NOTARY PUBLIC
STATE OF NEVADA
County of Clark
NANCY J. ZORZI
My Appointment Expires Feb. 2, 1996

Notary Public

*does not say. Person who signed is Veldon Simpson by drivers license Id*

*Federal evidence Rule 901*

## NOT FOR PUBLICATION

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

**FILED**

JAN 2 5 2000

**CATHY A. CATTERSON**
**CLERK, U.S. COURT OF APPEALS**

| | |
|---|---|
| GEORGE MAY,<br><br>  Plaintiff-Appellant,<br><br>  v.<br><br>CIRCUS CIRCUS ENTERPRISES, INC.;<br>RAMPARTS, INC,<br><br>  Defendants-Appellees. | No. 99-15517<br><br>D.C. No. CV-98-01322-JBR<br><br>MEMORANDUM[1] |

Appeal from the United States District Court
for the District of Nevada
Johnnie B. Rawlinson, District Judge, Presiding

Submitted January 18, 2000[2]

Before:     BEEZER, O'SCANNLAIN, and THOMAS, Circuit Judges.

George May appeals pro se the district court's judgment dismissing on res

judicata grounds his action alleging that Circus Circus committed fraud, engaged in

racketeering, deprived him of his civil rights, obstructed justice, committed perjury, and

---

[1]     This disposition is not appropriate for publication and may not be cited to or by the courts
of this circuit except as may be provided by 9th Cir. R. 36-3.

[2]     Because the panel unanimously finds this case suitable for decision without oral argument,
appellant's motion for oral argument is denied. *See* Fed. R. App. P. 34(a)(2).

infringed on a copyright related to his pyramid-shaped hotel concept. May also appeals the district court's order imposing sanctions pursuant to Fed. R. Civ. P. 11. We have jurisdiction pursuant to 28 U.S.C. § 1291. We review de novo the district court's application of res judicata, *see Lea v. Republic Airlines, Inc.*, 903 F.2d 624, 634 (9th Cir. 1990), and for an abuse of discretion an order imposing Fed. R. Civ. P. 11 sanctions, *see Terran v. Kaplan*, 109 F.3d 1428, 1434 (9th Cir. 1997). We affirm.

The district court properly concluded that May's action is barred by the res judicata effect of his prior similar actions against Circus Circus. *See Costantini v. Trans World Airlines*, 681 F.2d 1199, 1201-02 (9th Cir. 1982) (res judicata bars virtually identical suit which seeks nearly identical relief as a previous action).

The district court did not abuse its discretion by imposing Rule 11 sanctions in light of the frivolousness of May's action and May's violation of an existing order enjoining him from filing any further law suits against Circus Circus related to the misappropriation of May's pyramid shaped hotel concept. *See Terran*, 109 F.3d at 1434 (stating that absent an erroneous view of the law or a clearly erroneous assessment of the evidence a district court does not abuse its discretion by imposing Rule 11 sanctions).

**AFFIRMED.**

2